## WOODS *v.* ALLEN.

One who is a mill-wright and a tender of mills, is not, for that reason, an expert, so as to render his opinions as to course of anchor-ice in a particular channel evidence, if it does not appear that he has observed the ice in that channel, or has had his attention particularly and habitually directed to the flow of ice in streams.

Such a fact, being obvious to the view of any one near the stream, *quære*, whether it is a proper one to establish by the opinion of an expert.

The declarations of a party in his own favor, made when the adverse party was not present, are not admissible to rebut evidence of his admissions, introduced by the adverse party, relating to the subject matter, and stated to have been made about the same time.

A party's books are not evidence to prove, by the entries therein, a collateral fact.

Woods *v.* Allen.

CASE. The declaration alleged that the plaintiff hired the defendant to work in his mill through the winter as head-sawyer, at $14.50 per month; that the defendant undertook to work in a faithful and workman-like manner, but worked so unskilfully that the mill became frozen up, and for a long time was useless, &c.

The defendant's undertaking was admitted as alleged, and he also admitted that the mill became frozen, and that it consequently stopped. He, however, contended that it was not through his fault, but from the position and construction of the mill, and other causes beyond his control.

He offered evidence to show that the plaintiff, soon after the mill was stopped by the freezing, declared that the event was caused by the anchor-ice, and that he did not impute it to the fault of the defendant.

To rebut this, the plaintiff offered to prove that, at another but about the same time, he did attribute it to the default of the defendant, though not in his presence. To this the defendant objected, and the court sustained the objection.

The defendant introduced the deposition of Frederick Crocker, who testified that he professed to be a millwright and a tender of mills; that he had had the charge of mills fourteen or fifteen years, and that such was then his business. He stated, "I should think the Woods mill quite secure as to freezing below the wheels, but for anchor-ice I should think it rather bad. It is better constructed below, on account of freezing, than mills in general, on account of its being so constructed as to flow the wheels. The dam, on the opposite side from the mill, is some five or six rods higher up the stream than the other dam, which would make it bad as regards anchor-ice. The dams, being situated as they are, the anchor-ice would naturally fall into the dead, or still water, at the head of the mill, after it comes down around the point above the mill."

He testified concerning certain Bath mills, that "they

were easier to keep clear from anchor-ice than the Woods mill, for the reason that there was more draft over the dam than at the Woods mill. I was not at his mill at the time, but should judge, by the situation of the dam, that there was no draft at all at that time, or not much of any, at the dam next the mill."

His further testimony was as follows:

Question by the defendant. "State if you know or can tell, from the construction and location of the mill and dam, what causes the sand and dirt you have named to gather in the rack at the head of the Woods mill?"

Objected to, as requiring the opinion of the witness in a matter not competent.

"The dams are so situated at that mill that there is a kind of an eddy around the point above the bridge, that the dirt would naturally fall in there and would be carried to the mill, and there would probably be a draft at the rack that would carry this stuff in."

The deposition of Crocker was objected to by the plaintiff, but was admitted by the court.

To rebut the evidence produced by the defendant, to show that he was at work in the mill on the day preceding the night on which it froze, and until a late hour, doing what he might to prevent the freezing, the plaintiff offered his books, containing his account of the trade in the store, and other daily transactions, to prove, by entries made therein by himself, that the defendant was absent at a dancing-school that afternoon, and had the plaintiff's sleigh, buffalo, &c. The defendant, objecting to this evidence, it was ruled out.

A verdict was returned for the defendant, which the plaintiff moved to set aside, for the alleged errors at the trial.

*Goodall & Morrison*, for the plaintiff.

*Hibbard*, for the defendant.

GILCHRIST, J. This action is brought to recover damages of a servant entrusted with the care of the plaintiff's mill, for managing it so heedlessly, and for so neglecting it, that it was frozen up. The defence is, that the event complained of was not justly to be attributed to the defendant's carelessness, but resulted from some points in the construction and position of the mill, and from the severity of the season.

To sustain this defence the deposition of Crocker was introduced, in which he testifies to various facts, and in addition gives it his opinion that, although the plaintiff's mill was well contrived to prevent freezing about the wheel, it was, for "anchor-ice," "rather bad." He says that the dam on one side of the river, being some rods further up the stream than the dam upon the other side, "would make it bad as regards anchor-ice." "The dams, being situated as they are, the anchor-ice would naturally fall into the dead, or still water, at the head of the mill, after it comes round the point above the mill." He testifies also that he "should judge" that there was less draft over the dam at this mill than at a certain other mill, in which it appears there was trouble from anchor-ice. He based this judgment, not upon an inspection of the water and the ice at the time, but upon "the situation of the dam."

It was assumed by the defendant that a sufficient foundation was laid for the introduction of these opinions of the witness, by the evidence of his being a mill-wright and a tender of mills, having had an experience of fourteen or fifteen years.

But it does not appear that this calling gave him means not ordinarily possessed by other persons, of forming an opinion as to the effects to be produced by one part of the dam being placed lower down the river than the other, or of forming an opinion that the draft of water over a dam at the plaintiff's mill would be less than at any other mill at the same time.

It is very plain that one might be a builder of mills, or a tender of mills many years, without once having had his attention called to such a case, of the relative position of the two dams as the present one, or having had an opportunity to observe whether the anchor-ice did or did not, in fact, gather in the still water immediately above the lower section of the dam. The fact that it did so gather was material, perhaps, but this witness is not shown to have had any means whatever, and certainly no more means than are possessed by those who actually pass the stream in the winter time, of forming an opinion whether the ice would fall down into the still water, or be carried off by the current over the upper section of the dam.

Supposing it to have been material to show that there was a stronger draft at the Bath mills than at the plaintiff's, the judgment of this witness, formed, not by inspecting the operation at the critical time, but from "the situation of the dam," certainly carries no more weight than the judgment of any other person who has been at the two places, and surely ought not, because he was a millwright, be placed in competition with the testimony of any one who might have witnessed and compared the two.

The opinions of the witness were not, in this case, founded upon recondite principles of an art, science or profession, acquired by study, and derived from philosophy; neither were they founded, so far as appears, upon peculiar opportunities afforded by long experience of observing dams and streams of water, and the course of the ice in such channels as the one concerning which he testified; and what is, perhaps, more to the purpose, the fact which he judged would, under given circumstances, take place, was one that was quite apparent to the observation of any person who might be at the spot when the ice flowed.

We think, in the first place, therefore, that the witness

Woods *v.* Allen.

has not established the character of being an expert; and secondly, there is ground for questioning whether such a case as the present is one in which the opinions of experts are ordinarily received.

The exception to this evidence, therefore, prevails.

The declarations of the plaintiff were admitted to show that he did not, at first, attribute his misfortune to the default of the defendant. The defendant had a right to prove these declarations, and avail himself of them in his defence, so far as they could be used to influence the minds of the jury. It would be of small avail for the plaintiff to show, by his own words, that he soon after found cause to believe himself mistaken. His bringing this action is reasonable proof of all that he could establish by proving his words; and it is clear that this is not a case in which a party can be permitted to do that.

The book in which a party keeps his accounts is evidence of the state of his dealing with the parties whose accounts are there kept, for the purpose of showing the state of indebtedness between them, arising from the delivery and sale of commodities, the performance of services, payments, and the like. But for collateral objects this kind of a document is not admitted in behalf of the party who has kept it. If the question at issue were, whether the defendant owed the plaintiff for the hire of his sleigh, the book would be evidence, but it is not the proper evidence to show that the defendant went to a dancing-school, while he should have been at work.

*New trial.*